UNITED STATES of America, Plaintiff-Appellee,

v.

Gerald M. LUKASIK, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

David J. TINUCCI, Defendant-Appellant.

Nos. 14367, 14368.

United States Court of Appeals Seventh Circuit.

Jan. 29, 1965.

Rehearings Denied March 15, 1965.

Anna R. Lavin, Robert L. Berner, Jr., Raymond J. Smith, Chicago, Ill., for appellants.

Edward V. Hanrahan, U. S. Atty., Raymond F. Zvetina, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before DUFFY, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

David J. Tinucci, Gerald M. Lukasik and Robert J. Baran were charged in a one-count indictment with unlawfully, wilfully, and knowingly conspiring to counterfeit $5 silver certificates of the United States in violation of Title 18 U.S.C. § 371, conspiracy to commit an offense against the United States or to defraud the United States. Robert Baran was dismissed as a defendant. Trial of the other two defendants resulted in

a verdict of guilty and sentences of five years each. This appeal followed.

The appellants cite as error: (1) insufficient legal evidence to support conviction; (2) improper admission of hearsay evidence; (3) improper admission of evidence of offenses not charged; (4) improper remarks of the Court respecting appeal and conspiracy; (5) wrongful preclusion of evidence on behalf of defendant Gerald Lukasik and frustration of his theory of defense; and (6) failure to establish venue.

The evidence adduced at the trial indicates the following. When he was arrested on February 24, 1961, defendant Lukasik, who was a printer by trade, told Secret Service Agents that he had met defendant Tinucci, who was not a printer and not familiar with the printing business, during the summer of 1960 when Tinucci visited Joe Luchetti doing business as Freke Printing Company, in Cicero, Illinois, where defendant Lukasik was employed as operator of a 1250 multilith press.

Lukasik told the agents that Tinucci sought his help in equipping a printing shop in return for which Lukasik was to have the use of the shop evenings.

There followed a number of transactions whereby premises, equipment and supplies were obtained under a variety of false and assumed names and addresses. We note a few examples which are typical of the incidents disclosed in the evidence.

On November 8, 1960, Tinucci representing himself to be Mario Muccianti, signed a credit application at the Ability Service Company, 700 S. Dearborn Street, in connection with inquiry about purchase of a multilith press, giving the address in Cicero, Illinois, of the real Mario Muccianti who had not authorized such use of his name.

On November 14, 1960, both defendants visited Tompkins Printing Equipment Company, 712 S. Dearborn Street, Chicago, where Tinucci had previously inquired about a press and where he was known as Anthony Rocco.

Tinucci introduced defendant Lukasik as Jerry Jurzak, said he was opening a printing business at 711 S. Dearborn Street with Lukasik operating the equipment.

Lukasik approved a 1250 addressograph multilith offset duplicating machine. They also selected an ATF Mastercraft camera. Tinucci signed an order blank in the name of Anthony J. Rocco with an address in Cicero, Illinois, with a notation that he was not to be "contacted at home," so that his wife would not learn he was going into the printing business. The address given was that of an old acquaintance, Leo Mazzolini, sometimes spelled "Muzzolini." Mario Muccianti who had seen Tinucci almost daily for ten years never knew him to be married.

November 17, 1960, Tinucci rented Room 205 at 711 S. Dearborn Street, under the name Leo Muzzolini, stating that he and his partner Mr. Rocco were starting in the printing business. He also signed a lease with Tompkins Company for the 1250 multilith press, the camera and other equipment under the name Anthony J. Rocco. When Tinucci returned the lease for Room 205 to the rental agent, it bore the signatures of Leo Muzzolini and Anthony Rocco. The actual Leo Muzzolini did not sign the lease or authorize the use of his name.

Late in November, 1960, Lukasik told his friend Baran of a man who needed a driver, that Lukasik was going to do printing for that man, that he would get some jobs on the side as well and would teach Baran the business. Lukasik introduced Tinucci to Baran in a Cicero tavern as Anthony Rocco. Tinucci told Baran he needed a driver and helper in opening up a print shop.

Also in November, 1960, Tinucci and Baran visited Warner Paper Company on South Wells Street, Chicago (where on a prior visit Tinucci, introducing himself as Jack Monticello of B & J Printing, had secured a sample of the "oldest" rag bond paper for a "particular customer") and bought four reams of Weston's Defiance Bond 100% rag

paper, Tinucci giving his firm name as B & J Printing Company of 3501 West North Avenue, which in fact was the address of Leader Cleaners.

November 28; 1960, Baran drove Tinucci from Cicero to the Tompkins Company on Dearborn Street, where Tinucci (signing the name Anthony Rocco) rented equipment to make offset plates, which equipment was then brought to Room 205 where Baran saw a 1250 multilith press and camera. The same day they also visited Dwight Brothers Paper Company on Clark Street in Chicago and ordered a ream of Defiance Bond. Baran signed the order "R. J. Keren" at Tinucci's request because, he stated, Tinucci did not want it known he was in the printing business. A false firm name and address were also given. Baran later sought to exchange the paper for an older less bright shade.

Tinucci would telephone Baran when to pick him up and would advise him what to say when they went to obtain equipment and materials.

December 2, 1960, Tinucci ordered all the Defiance Bond in stock at Warner Paper Company, explaining in response to inquiry that he had not set up shop at the address originally given but at another address in Cicero, Illinois. At the time, the shop in Room 205 was not yet in actual operation.

There was testimony that in the Chicago area only these two firms, Warner and Dwight sold this paper.

Baran assisted Lukasik in setting up shop in Room 205, usually in the evening, and sometimes was there with Tinucci. Outside of the brief appearance of some delivery men, he saw nobody else there. All three, Baran, Lukasik and Tinucci had keys to Room 205.

Baran saw Lukasik operate the camera and press when Lukasik printed a rug cleaning advertisement and a policemen's examination. Baran never did learn how to run the press. Lukasik told the agents that he had never taught Tinucci either.

Early in February, 1961, Lukasik brought a box of white cards to Baran's home. The next day when Baran told Lukasik that the cards were reproductions of blank Selective Service and Illinois Voter Registration cards, Lukasik said that he had printed them for Rocco who was supposed to sell them or otherwise get rid of them, and that Lukasik did not want to keep them.

On February 2, 1961, having been advised by the building management that the rent for Room 205 was due and that the room would be repossessed, U. S. Secret Service Agents conducted a search. They found the 1250 multilith press, the ATF Mastercraft camera, a paper cutter, a vacuum frame, inks, paper and a pile of trash.

Inside the base of the press below the printing cylinder were two small scraps of a counterfeit $5 bill. In the trash pile was a piece of a negative of a genuine $5 bill, two border portions of a counterfeit $5 bill, and a piece of Weston's Defiance Bond 100% cotton fibre paper. They also found a package of offset paper and five empty ream packages of Cortland bond paper. Inside the camera were two negatives of Selective Service cards bearing the names Lukasik and Baran.

Six counterfeit $5 bills which had come into the possession of the Chicago office of the Secret Service between December, 1960, and February, 1961, the scraps found in the press, and samples of the bond paper bought by Tinucci from Warner and Dwight were sent to the Bureau of Engraving in Washington, D. C.

Edward Burnell, the Bureau's counterfeit analyst, subjected these items to scientific tests and found that the scraps, the paper samples and two counterfeit bills had identical fibre and were qualitatively identical by spectrographic analysis; one counterfeit bill per spectrophotometer test had the identical green shade as the scraps; microscopic examination of the six counterfeit bills and the scraps showed so many common defects that, in his expert opinion, the face

of the scraps and the bills were printed from the same plate or negative.

When questioned by Secret Service Agents after arrest, Tinucci denied knowing Lukasik, Baran, Leo Mazzolini, Mario Muccianti, or the printing company in Room 205 at 711 South Dearborn Street; denied using the name Anthony Rocco; denied buying printing equipment or materials.

Lukasik said that he merely helped Tinucci to buy a press at Tompkins and that for this small service he was to be allowed to use the equipment; that he ran off a few small jobs on the equipment in the evening on his own. He denied printing the cards until confronted with them, but claimed that Tinucci knew nothing about them.

■ Viewing the evidence in the light most favorable to the government, United States v. Winston, 7 Cir., 1955, 222 F.2d 323, 325, we must conclude that the jury could reasonably infer that both defendants conspired to counterfeit United States bills with intent to defraud, from such evidence as the items found in the shop in Room 205, which was established by Tinucci who was not himself a printer, the use of so many false names and addresses in acquiring the equipment and materials, the cooperation of Lukasik, who alone of the three original defendants was a printer, his knowledge of the falsity of the names used, his own use of the press, and the false exculpatory statements of both Lukasik and Tinucci.

■ It is contended that admission into evidence of the six counterfeit bills was error, especially in view of receipts and markings attached to them which defendants contend improperly gave the jury the impression that these had been passed by or through the defendants to innocent victims. The government offered expert testimony to show that these counterfeit bills and the scraps found in Room 205 came from the same plate or negative. The jury was expressly told that Agent Jordan's testimony as to the source of the bills was not offered to associate the defendants with passing them but only as foundation for the expert witness who did offer evidence from which the jury could infer that these bills were made from the equipment in Room 205. The defendants note that a plate or negative is highly portable, but this fact goes to the weight, not the admissibility, of the evidence. Much of the testimony respecting the receipts arose from Agent Jordan's answers to questions concerning procedure in the Chicago office, to which he was assigned and with which he was familiar, so that he could establish these documents as records made in the regular course of business. LaPorte v. United States, 9 Cir., 1962, 300 F.2d 878, 880; United States v. Olivo, 3 Cir., 1960, 278 F.2d 415, 417.

The fact that the bills were counterfeit and were linked to defendants by the expert witness's testimony would provide a basis for inference of an intent to defraud. The jury had been told of the analyses made of these bills at the Bureau of Engraving. Notations such as the names of those who surrendered the bills to the authorities or the fact that these bills were being used in this case could not have been misleading or prejudicial.

■ Although the admission in evidence of the blank reproductions of the Selective Service and Illinois Voter Registration cards, together with evidence of Lukasik's statement that he had printed them for Tinucci, incidentally proved that defendant Lukasik had committed an independent crime, this evidence, in the circumstances of this case, was not thereby rendered incompetent as defendants contend. The evidence was introduced to show that Lukasik had performed a printing job for and on the direction of Tinucci, after Lukasik had said he was going to operate the press for Tinucci. This controverted Lukasik's later assertions that he had no connection with Tinucci other than helping him to select the press. United States v. Glory, 2 Cir., 1947, 158 F.2d 880, 881; United States v. Sebo, 7 Cir., 1939, 101

F.2d 889, 891. This evidence tended to show a close relationship between the alleged conspirators. Kanner v. United States, 7 Cir., 1929, 34 F.2d 863, 866.

■ We find no prejudicial effect in the admission of photographs of the items found in Room 205 rather than imposition by the Trial Court of a requirement that the equipment and materials themselves be produced in Court. 3 Wigmore, Evidence, 3rd Edition, § 796. The government's witness, Agent Jordan, carefully pointed out that the cuttings shown in the two photographs were not found on the premises but were made by Agent Jordan himself to test the blade edge of the cutter.

■ It further appears to us that the exhibited photographs of the three original defendants were properly introduced after the question of photographs seen by the witness Robert Tompkins was raised on cross-examination.

■■ We do not agree that the Trial Judge's cautions to the jury from time to time that certain evidence admissible as to one defendant would be inadmissible as to the other defendant until "there is some evidence of conspiracy, something to tie the two together" or "connecting proof", for example, in any way misled the jury as to the degree of proof needed to establish conspiracy. Nor do we think that the jury's final responsibility was diluted by the Trial Court's parenthetical reference early in the trial to a higher court's looking at the record, to explain his persistence in requiring a witness to make it clear to the jury just which of the persons in the courtroom he was identifying. This does not even approach the gravity of the comments criticized by this Court in United States v. Fiorito, 7 Cir., 1962, 300 F.2d 424, 427.

■ Defendant Lukasik argues that he was deprived of his chance to testify as to the charge in the indictment because of the introduction of the cards which evidenced another offense and the refusal of an advance assurance that he would not be cross-examined concerning them. Our attention has been invited to Drew v. United States, D.C.Cir., 1964, 331 F.2d 85; Cross v. United States, D.C.Cir., 1964, 335 F.2d 987; and Poe v. United States, D., D.C., 1964, 233 F. Supp. 173; which we have studied but find distinguished by their facts.

■ It is further contended that the government improperly introduced "throwaways" found amid the rubbish on the floor to counteract an assertion that the quality of the counterfeit bills was beneath Lukasik's competence. The evidence does not show that these two exhibits, handbills printed by Lukasik, were found amid rubbish. A former co-employee of Lukasik's testified that only one handbill was a "make ready" copy and that the other was "clean work,"— that he would not say it was a make ready copy. Baran who was present when the handbills were printed, though not himself a printer, testified that the second example represented a fair average quality of the run.

■ Although the witnesses did not in every instance state both the street and city when testifying to addresses, venue in the Northern District of Illinois was clearly established by many references to the events as occurring in Chicago and Cicero, Illinois. The jury could certainly infer that the offense was committed where the venue was laid. United States v. Chiarelli, 7 Cir., 1951, 192 F.2d 528, 532, cert. den. 342 U.S. 913, 72 S.Ct. 359, 96 L.Ed. 683.

We have closely scrutinized the record in the light of the points and authorities advanced by counsel for the defendants. It is our considered opinion that the judgments of the District Court must be affirmed.

The Court wishes to express its gratitude to Mr. Robert L. Berner, Jr. of the Illinois bar who accepted the Court's appointment to represent defendant Tinucci in this appeal and to Mr. Raymond J. Smith also of the Illinois bar who served with him. Their skilled efforts are appreciated.

Affirmed.